WALTER MORRISON, individually, and as executor of the last
will and testament of Charles Morrison, deceased, et al.,
complainants,

*v.*

GRACE MORRISON, defendant.

[Submitted September 8th, 1922. Decided September 8th, 1922.]

1. Donor, aged about seventy-five years, made several gifts to his
daughter, aged about thirty-five years. He had one son and two
daughters, one of whom was the donee, who was unmarried—the son
and the other daughter were married for a number of years. The
wife of donor died about sixteen or seventeen years ago, since which
time the donee was his housekeeper. She was rather simple minded ;
and having found that the gifts were voluntary and not induced by
undue influence, the question left for decision is, Were the gifts, or
either of them, improvident? On February 13th, 1918, he gave the
donee $2,409, at which time he reserved to himself a house valued at
$4,500 and about $5,000 in hand.—*Held*, where several gifts are made
at different periods of time, later gifts might be held improvident
without impairing the validity of earlier ones—the $2,409 gift held
valid.

2. Where, under the above circumstances, the donor made a gift
of a house valued at $4,500 to the same daughter, retaining upwards
of $4,200 in bank, and considering his age and condition of health,
which justified the belief that his death would occur in the near
future—*Held*, that the gift of the house was not improvident.

3. *Pearce* v. *Stines, 79 N. J. Eq. 51*, approved and followed.

Mr. *Robert H. Doherty* and Mr. *William R. Gannon,* for
the complainant Walter Morrison.

Mr. *Mark Townsend, Jr.,* for the complainant Ethel Daly.

Mr. *Eric Jentz* and Mr. *William E. Sewell,* for the de-
fendant.

GRIFFIN, V. C.

The bill in this cause was filed by Charles Morrison in
his lifetime to set aside a conveyance which he made to his

daughter in May, 1920, when he was about seventy-five years of age, and also a gift of moneys on deposit in the Provident Institution for Savings, on February 13th, 1918, amounting to $2,409. Various grounds are alleged why they should be set aside, namely, fraud, undue influence, lack of independent advice, and that the gifts were improvident.

The claim is that the donor was enfeebled in body and mind, and under the dominating influence of his daughter, the defendant, now aged thirty-five years. The complainant had three children, two daughters and a son.

The defendant is unmarried; the other daughter and son have been married for a number of years. The mother died some sixteen or seventeen years ago. Since that time the defendant kept house for her father, who was suffering, according to the doctor, in his latter years, with a chronic Bright's disease, and had a rheumatic tendency, and he says that he would urinate as he walked across the floors in the house, in the presence of his daughter, with only his undershirt on. At the time that he made the gift of $2,409 to the defendant he was still possessed of the house where he resided, part of which was rented, and from which he derived an income. He was also working as a ship-caulker; and there is no evidence that he was not working steadily at the time he made the gift of the bank deposit. He also had moneys in New York banks amounting to over forty-two hundred dollars. The defendant was never paid any wages; she merely received her clothing and board and lodging, and my recollection is that the father said, when he gave the money to her, that it was for her kindness and services. He was not bound to do this, because, in the law, being his child and a member of the same family, no presumption arises that there was a contract of hiring; nevertheless, there was a moral obligation on his part which he might readily satisfy by a gift of these moneys—in fact, at the time he signed the deed he said the services rendered were in value largely in excess of the value of the property.

After the deed was made, in May, 1920, the son, it seems, called to see his father more frequently, and had knowledge

of the conveyance, which was recorded. One day in September, or October, he called; the front door was locked, the bell apparently was out of order, and he went around to the kitchen door and entered, and saw his father there with his sister, and, in substance, he says that the father complained that his daughter was not treating him properly, and the son took the father with him, and afterwards, on April 2d, 1921, this suit was brought by the father to set aside the conveyance and the gift of moneys, and thereafter he made a will giving practically everything to his son, and small sums of money to his two daughters.

He died on July 31st, 1921, about fourteeen months after making the conveyance. Caveats were filed against the probate of the will, and it is alleged that the claim was that the will was executed under the undue influence of the son, who is the chief beneficiary, and the claim also was that the man was not of sound mind at the time of the making of the will. The orphans court sustained the will. I am not so clear whether it was on stipulation or not, because the record was not offered in evidence; but, in any event, about the time of the trial in the orphans court, or shortly thereafter, the brother expressed a willingness to divide the estate into thirds, which would include the proceeds of the sale of the lands conveyed to the defendant (which had been sold for $10,000), and also the gift of $2,409 and an item of $800, to which reference will be made hereafter, and whatever moneys were left over, parcel of the moneys in the New York banks. It seems that the moneys in the New York banks stood in the name of the complainant, Charles Morrison, and he brought suit in replevin to recover the bank books from the defendant, obtained the books, drew out the moneys and had them in his possession while residing with his son at Rosendale, New York, in the Catskills. When he died, there was $500 left over; so that in the short period of less than a year this old gentleman had disposed, in some manner, of about $3,700, and gave the remaining $500 to his son.

There is an intimation (and I am not certain whether it appears in the record, or was merely the statement of counsel)

that this son first denied having ever received any part of the $4,200, but finally admitted that he received $500 from his father. He said his father could not walk in that hilly country and took taxicabs to take the air. There is something very suspicious about this, although, so far as I can now perceive, there is nothing in the evidence which more than creates suspicion on the probable acquisition of these moneys by the son, due to the fact that he resided in the same household, and after the testator's death the money was not found.

Dealing with the personality of the defendant, she appears to me to be a simple-minded girl; she does not impress me as being even of average mentality. She acted, on the stand, more like a child than a woman of thirty-five. She answered the questions, however, fairly and honestly. At some questions, which probably did not call for a display of such conduct, she smiled and laughed. On the whole, however, she exhibited marks of refinement, but she did not exhibit the slightest mark of such character or disposition as would enable her to dominate her father, and I am satisfied that whatever he did was done voluntarily to protect his one child who was faithful to him for so many years as against children who were married and settled down away from his household, and who seldom visited him. The others were married, and were caring for themselves. The defendant was unmarried, and after the father died would be compelled to depend on her own exertions for her livelihood. She had allowed the prime of her life to pass in her devotion for her father; and if the disposition that he made of his property by gift was contained in a will, no one could say aught against its justice. But it was made by deed, which was the voluntary act of the father, free from even a suspicion of undue influence exerted upon him by his daughter; but if the gifts were improvident, and the man, somewhat enfeebled by age, with his mentality somewhat impaired, in making the gifts committed an improvident act, and did not have independent advice, and did not fully comprehend the act, then the conveyance must be set aside as improvident.

When the gift of the lands was made to the daughter, what was his physical condition? Dr. Connolly testifies that he was decrepit. The defendant does not say that he was extra strong, and she says that later on he became somewhat weak, although he maintained the same general condition. Dr. Connolly says his disease was progressive. It is a significant fact, however, that on December 24th, 25th, 27th and 28th, 1919, and also January 31st, 1920, he worked at his trade. The trade of a shipcaulker, which keeps a man in the air, exposed to the winter weather, and on the water front, to my mind indicates that the man was stronger physically than the witnesses would have us believe. This work was done about four months before the deed in question was made. At that time, in addition to this property, he had about $4,200 in the New York banks. The question—and the only question in the whole case, that I can see—is, first, being possessed of this real estate (which at the time of the gift to the daughter was regarded as worth $4,500, but a year and a half later sold for $10,000), was this gift improvident if he still held $4,200 in cash, considering, also, his age and the probability that his working days were about to terminate, or, at least, would terminate in the near future, holding only about $4,200 to care for him for the balance of his days, which, taking the testimony of Dr. Connolly, could hardly be many.

On March 12th, 1921, the defendant made a contract to sell the real estate for $10,000, and received a deposit of $1,000, which she spent, and the remaining $9,000, or the balance of the purchase price, has been deposited in court.

As to the first gift of $2,409, on February 13th, 1918, this gift was clearly not improvident. Where several gifts are made at different periods of time, later gifts might be held improvident without impairing the validity of the earlier ones. At the time of this gift he owned the house in question, valued at about $4,500, and had in the neighborhood of about $5,000 in bank, making upwards of $9,000; and, as I have found that there was no fraud or undue influence, and it was the voluntary act of the donor, the gift was good.

When the deed was made, on May 14th, 1920, the donor had upwards of $4,200 in bank, possibly $5,000. He did not have independent advice, but it was his voluntary deed, unaffected by influence which might be considered undue. The only influence that actuated him in making the gift was love for his child and a purpose to reward her for the services which she had rendered. The question, therefore, is, Was the act improvident? I will not deal at length with this question because it is fully covered in the opinion of Vice-Chancellor Stevens in *Pearce* v. *Stines, 79. N J. Eq. 51,* where he analyzes all the authorities and deals with the question as to what proportion of a man's property given to the donee would be regarded as improvident. Under the circumstances of this case, if he gave to his daughter the house valued at $4,500, and retained the $4,200 in bank; he would have reserved to himself a sum which, in my judgment, did not render the gift of the house improvident.

On the hearing there was offered in evidence the account of the defendant in the Claremont bank of Jersey City, which showed that, on July 21st, 1920, the defendant deposited in that account $800. Where she obtained these moneys did not, as I recall it, appear in the testimony; and counsel, to my inquiry, could not point to any testimony covering this point. It was suggested, however, that it might have been moneys which she had saved from her allowance for running the house. I, therefore, do not regard this item as being a gift from the father.

The decree will be for the defendant.