On November 24th, 1937, complainant's decedent, Hattie E. Hardgrove, a widow seventy-seven years of age, withdrew from the Irvington National Bank the sum of $9,500, which she then had on deposit in a savings account in her name, and redeposited it in the same bank in a joint savings account in the name of Hattie E. Hardgrove and Frank E. Hardgrove, under the following joint account agreement, which was signed by both:
 "JOINT ACCOUNT AGREEMENT SINGLE SIGNATURE
This account and all moneys to be credited to it belong to us as joint-tenants and during our joint-lives may be drawn upon by either alone.
Upon the death of either we authorize and direct the Bank to pay the entire balance to the survivor, which shall be in complete discharge of the obligations of the Bank to all parties concerned.
The rights of the legal representative of the decedent, if any, shall be enforced only against the survivor.
We each do hereby appoint the other attorney irrevocable, with power to deposit in said joint-account moneys of the other, and for that purpose to endorse any check, draft, note or other negotiable instrument in the name of the other.
 (Signed) HATTIE E. HARDGROVE (Signed) FRANK E. HARDGROVE.
Witness — (Signed) F. SWARTOUT, JR."
There were thereafter two withdrawals from that account, one of $150 and the other of $400, both on the signature of Frank E. Hardgrove. The $150 first withdrawn was for the use of Hattie E. Hardgrove, to whom it was delivered immediately after withdrawal, and the $400 was for the use of Frank E. Hardgrove, who retained it. Hattie E. Hardgrove died on January 18th, 1938, at which time there remained a balance of $9,000 in said account, and which was subsequently withdrawn by Frank E. Hardgrove. Aside from the moneys in this account, the only property owned by Mrs. Hardgrove at the time of her death was a house and lot at *Page 518 
517 Nye avenue, Irvington, New Jersey, valued at about $5,000, which had been her home for many years, and household furnishings worth about $100. Life insurance, amounting to $284.75, was collected by the complainant administrator after Mrs. Hardgrove's death.
By this bill, complainant seeks to set aside the transfer by decedent to the defendant Frank E. Hardgrove of a joint interest in the bank account, and a decree for an accounting of the moneys remaining in said account at the date of Mrs. Hardgrove's death, on the ground that no gift in praesenti was intended by decedent; that if a gift to take effect at the donor's death was intended it was testamentary in character and void because not in conformity with statutory requirements; or, that if a gift inpraesenti was intended, it was improvident, made without independent advice, and void because of a confidential relationship existing between donor and donee.
At the conclusion of the final hearing I found that at the time of the transfer of the joint interest in this bank account the decedent was in complete possession of her faculties; that she intended to make a gift in praesenti of a joint interest in that account; that she made the transfer with the full knowledge of the nature of the transaction; that it was not the result of fraud or undue influence; that the transfer was a natural and proper thing for the decedent to do under the circumstances, and that unless the gift was improvident and subject to the application of the rule of independent advice, which points were reserved, the bill would be dismissed.
Oral argument was had at the conclusion of the final hearing and since then exhaustive briefs have been filed by counsel. After a careful reading of the transcript of testimony and consideration of all the evidence and briefs of counsel, I have reached the conclusion that the gift was not improvident, that the rule of independent advice has no application, and that, therefore, the bill must be dismissed.
For a thorough understanding of the reasons for my conclusions, a more complete statement of the facts disclosed by the evidence is perhaps appropriate. *Page 519 
The decedent was childless. The defendant Frank E. Hardgrove is the son of the decedent's sister, Emma Chandler, and decedent's husband's brother, Robert Hardgrove, both of whom died when this defendant was eleven years of age. Besides the defendant Frank E. Hardgrove, his parents left surviving them three other children, two sons and a daughter, all of whom, except the defendant, are now dead. The decedent and her husband, Jonah Hardgrove, who predeceased her, took these four orphaned children into their own home and reared them as their own. All remained in decedent's home until their majority, marriage or death. The defendant Frank E. Hardgrove remained with his uncle and aunt until he married in 1920, when he established a home of his own. In 1921 he was, as he expressed it, "out of work and up against it," and his aunt and uncle asked him and his wife to come to their home and live with them until he obtained work and got on his feet again. When he got work and was able to re-establish a home of his own he did so, and then left the home of his aunt and uncle. At their request, he again returned to their home in 1931 for the same reason which prompted his first return. After remaining there for some time he again re-established himself and with his family moved into his own home, where he remained until the death of his uncle, the decedent's husband, Jonah Hardgrove, early in 1937, when his aunt, the decedent, again requested him to return and make his home with her because she was alone. Accordingly he and his family moved in with the decedent, and after they had been there about six weeks it was arranged that he and his family were to occupy the second floor of decedent's home and she the first floor, which arrangement was carried out. Defendant and his family resided there until after his aunt's death. During this period, although he was steadily employed as an automobile mechanic, he took care of the lawn, attended to the heater, ran errands for his aunt, did odd jobs about the house, and, in general, he and his wife took care of the decedent according to her requirements. He never transacted any business for the decedent, except to occasionally do some marketing for her and to go *Page 520 
to the bank for her on two or three occasions. The decedent treated the defendant more as a son than a nephew, and, as one of complainant's witnesses testified, he was "the apple of her eye." However, it is clear from the evidence that hers was the dominant mind and that she attended to her own business affairs, such as she had, without consulting with or asking advice of the defendant. She was at all times until her death, mentally alert, and her only physical ailment was bronchitis, from which she had been a periodic sufferer for some years, the attacks of this malady usually occurring in the fall or winter. Her heart had become weakened from successive attacks and her death resulted from this condition. However, her physician testified that she was mentally competent to the end, and except for a short period, was physically able to do her own housework, get her own meals,c. Attempts by complainant's witnesses to show that she was mentally incompetent and physically unable to take care of herself and her household, and that she was subject to the influence and domination of the defendant, failed.
The decedent depended upon the defendant only to perform those tasks ordinarily performed by the male member of a household. She was in no other sense dependent upon him. On the other hand, the defendant had been more or less dependent upon the decedent, his aunt, ever since the death of his parents. Complainant also failed in his efforts to show that the defendant tried to induce the decedent to make a will, and that the transfer of a joint interest in the bank account was the result of his persuasion. The extent of complainant's evidence on these points is that the defendant once relayed a message from decedent's attorney to the decedent about a conversation that she had had with the attorney concerning a will; and defendant once suggested that the decedent deposit a small sum of money in a separate bank account so that it could be drawn on by him for her benefit in the event of her illness or incapacity; but decedent told the defendant she had "other plans." The circumstances attending the transfer of the bank account are as follows: *Page 521 
On November 23d 1937, decedent went to the bank alone with her savings account pass book, and requested the teller in the savings department to transfer the account to a joint account in her name, and that of the defendant. (Previous to the death of decedent's husband there had been a joint savings account in this bank in the names of Jonah Hardgrove and Hattie E. Hardgrove, with power in each to draw thereon and with the right of survivorship.) The teller then explained to Mrs. Hardgrove the three types of joint account then in vogue at the bank, any one of which she might use, and she chose the joint account which was afterwards opened. The teller explained to her that it would be necessary for the bank to have the signature of the other joint owner of the account and gave her a signature card for that purpose. The teller testified that there was no doubt but that Mrs. Hardgrove understood all of the details of the transaction, and the character of the new account which she was opening, and the rights of the respective parties therein. She did not ask for his advice touching the transaction, nor did he give her any advice, either as to the propriety thereof or its consequences; and he had no knowledge touching the decedent's other property holdings. Mrs. Hardgrove took the signature card which the teller gave her and left the bank. That night she told the defendant what she had done about the new bank account and told him to sign the signature card. This was the first information he had as to his aunt's intention to give him an interest in this account. He signed the card and the next day drove Mrs. Hardgrove to the bank in his automobile, in which he remained outside the bank while his aunt went inside and completed the transaction. She again saw the teller of the savings department, withdrew the funds from her individual account and deposited them in a joint account in her own name and that of the defendant. Thereafter, and until the date of her death, she retained the custody of the bank book, except on the two occasions when funds were withdrawn, as already mentioned. These are the complete facts touching this transaction. Far from suggesting any dominance of the decedent by the defendant, it indicates *Page 522 
an act performed of her own free will and accord. After all, the real question here is whether or not the transfer was fair and just, and all in good faith; or whether the circumstances spell out a fraud or an unconscionable bargain. Matthews,Administratrix, v. Craven, 124 N.J. Eq. 455. A donor who is mentally alert and capable may make any contract or gift he pleases, so long as it is free from fraud or undue influence. LeGendre v. Goodridge, 46 N.J. Eq. 419; affirmed, 48 N.J. Eq. 308.
In In re Fulper, 99 N.J. Eq. 293, Vice-Chancellor Buchanan said that if a contract was unfair the fact that it was based upon some consideration made no difference — relief would be granted notwithstanding. Similarly, if the contract is entirely fair and free from fraud, and undue influence, the fact that a party is aged, but competent, makes no difference — it will be upheld. The burden of proof of a dominant confidential relationship is, of course, upon the complainant (In re Fulper
(at p. 313), and while "the nature of that dominant confidential relationship is difficult of exact definition or delimitation" (Ibid.), it is clear that the dominance must be of the mind, and the dependence must be upon the mind rather than upon the hands and feet of the donee. Here it is clear that the decedent's was the dominant mind and her dependence was only upon the hands and feet of her nephew; and that this dependence related merely to those things usually attended to by the man about the house. In this respect this case is analogous to LeGendre v. Goodridge, supra, in which case Vice-Chancellor Van Fleet held there was no fraud or undue influence. No presumption of undue influence arises from the "mere relationship of the parties." Soper v. Cisco, 85 N.J. Eq. 165, 170. To invoke the presumption, it must appear that the donee occupied a dominant position over the donor towards whom he stood in a confidential relationship. Given a confidential relation and the dominant or controlling position on the part of the donee, then the degree or fact of relationship is immaterial. Haydock v. Haydock'sEx'rs, 34 N.J. Eq. 570, 574.
The argument of defendant's counsel to the effect that decedent had the benefit of independent advice touching this *Page 523 
gift, advanced at the final hearing, seems now to have been abandoned. The only evidence in support of that argument was the testimony of the witness Swartout, the bank teller, but it is clear that such advice as he gave does not satisfy the rule.Slack v. Rees, 66 N.J. Eq. 447; Post v. Hagan, 71 N.J. Eq. 234;Haydock v. Haydock, supra; Croker v. Clegg, 123 N.J. Eq. 332;Peppler v. Roffe, 122 N.J. Eq. 510. The rule of independent advice laid down in Slack v. Rees, supra, andPost v. Hagan, supra, applies where the gift strips the donor of all, or of practically all, of his property. Morrison v.Morrison, 94 N.J. Eq. 646; affirmed, Ibid. 801. The rule of undue influence and independent advice laid down in Haydock v.Haydock, supra, applies generally to gifts whether or not they comprise all or practically all of the donor's property. In reFulper, supra (at p. 307).
As to the improvidence of the gift here involved, I find no New Jersey decision directly in point, nor has the industry of counsel referred me to any in this or other jurisdictions. In considering this question it should be borne in mind that the subject of the gift here involved was not a definite sum of money, nor was it of all the funds deposited in the joint bank account. The gift was of a "joint interest" in that account — an interest which might or might not ripen into complete ownership, depending upon which of the two joint owners died first. After the gift, the moneys in the account were the joint property of the donor and the donee, although one of the parties would become the complete owner upon the death of the other.
On behalf of the complainant, it is argued that as the defendant donee had the right of withdrawal upon his signature alone, he had the power to "strip the donor of any interest therein," and that this is one of the "consequences" invoking the protection of the rule of independent advice "as a means of insuring the weaker party against the consequences of his own unthinking and unappreciated improvidence," citing Croker v.Clegg, supra. (But I have already found that the donor was not the "weaker party" and that the act of giving was neither "unthinking" nor "unappreciated.") *Page 524 
It is further argued, "that defendant did not exercise his right of withdrawal, that he did not take advantage of his power to strip his aunt of her only available means of support, is absolutely immaterial to the application of the rule. The essential factor inexorably invoking the rule is that he possessed the power."
On behalf of the defendant donee it is argued that since there was a gift not of the money itself, but of a joint interest in the account (albeit an interest which would become absolute on donor's death) and since there was a right to access and to the use of the fund retained — the gift was not improvident; that the retention by the donor of a right to withdraw negatives improvidence, quoting from Note in L.R.A. 1917-C (at p. 564): "It is true that the donee also has this power, but this does not divest the donor of the power."
Counsel for complainant cites Hunt v. Naylor, 84 N.J. Eq. 646;Myers v. Abbott, 98 N.J. Eq. 574, and Reeves v.Reeves, 102 N.J. Eq. 436, as supporting his view that the gift of a joint interest in a bank account, the moneys in that account constituting the major portion of donor's estate, is improvident; but my examination of these cases leads to the conclusion that they are readily distinguishable and not applicable.
In my judgment, the gift of a joint interest in decedent's bank account was not, under the circumstances of this case, improvident. But even so, my conclusion as to the proper disposition of this cause would be the same. In Farley v.First Camden National Bank and Trust Co., 107 N.J. Eq. 272
(Leaming, V.C., 1930), it was held that:
"Improvidence in a gift and want of independent advice touching its execution are not alone sufficient to set aside a gift or donative trust at the instance of the donor.
"Except as against creditors a man of adequate mentality is privileged to give away all his property, if he wishes to do so; and such a man needs no independent advice to sustain that apparently improvident act if the gift be made voluntarily and with full understanding of the transaction and its force and effect. *Page 525 
"It is the relationship of trust and confidence between the parties which may inspire dominating influence over the donor which renders the apparent improvidence of the act and the want of independent advice material, in the absence of other equitable ground for relief."
And see James v. Aller (Court of Errors and Appeals),68 N.J. Eq. 666. In the latter case the court, speaking through Chief-Justice Gummere (at p. 669), said:
"The law permits anyone to dispose of his property gratuitously, if he pleases, provided the rights of creditors are not injuriously affected thereby. He may, if he sees fit, reserve to himself the right to revoke his gift; or, if he desires, he may make the gift absolute and irrevocable, and his power in this regard does not depend upon the providence or improvidence of his act.
"* * * Where no relation of trust and confidence exists between the donor and donee, or where, when such relation does exist, the donor, and not the donee, occupies the dominant position, the rule laid down in those cases has no application, and a gift absolute in its terms, made voluntarily and with a full understanding of its effect, cannot be revoked by the donor, either by his own act alone or with the aid of a judicial tribunal."
I will advise a decree dismissing the bill of complaint. *Page 526